FINZ & FINZ, P.C.
410 East Jericho Turnpike
Mineola, NY 11501
Tel.: (516) 433-3000
abenno@finzfirm.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATHANIEL ISAAC,<br><br>                              Plaintiff,<br><br>                 vs.<br><br>THE CITY OF NEW YORK, P.O. ROBERTO ASSENCAO, P.O. LISAURA MESSA, LT. BRIAN KENNY, DET. JOHN HACHADOORIAN, DET. RONALD BUELL, AND "JOHN DOES 1-10",<br><br>                              Defendants. | 16-cv-4729 (KAM) (RLM)<br><br>FIRST AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, by and through his undersigned attorneys, alleges as follows:

**PRELIMINARY STATEMENT**

1.     Plaintiff brings this action for compensatory damages, punitive damages, and attorneys' fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violation of his civil rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.   Plaintiff also asserts claims under the New York State Constitution.

**JURISDICTION**

2.     This Court has jurisdiction over plaintiff's federal law claims under 28 U.S.C §§ 1331, 1343(a), (3), and (4).

**VENUE**

3.     Venue is proper for the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and (c).

FIRST AMENDED COMPLAINT - 1

**JURY TRIAL DEMANDED**

4.    Plaintiff demands trial by jury of all issues properly triable thereby.

**THE PARTIES**

5.    Plaintiff Nathaniel Isaac is a resident of the County of Queens, in the City and State of New York.

6.    That at all times herein mentioned, defendant City of New York (hereinafter "City") was and is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

7.    That at all times herein mentioned, defendant City operated, controlled and maintained a police force known as the New York City Police Department ("hereinafter "NYPD").

8.    That at all times herein mentioned, defendant P.O. Roberto Assencao (hereinafter, "Assencao") was and is an NYPD officer employed by defendant City.

9.    That at all times herein mentioned, defendant Assencao was acting within the course and scope of his employment with defendant City.

10.    That at all times herein mentioned, defendant Assencao was acting under color of state law.

11.    Defendant Assencao is sued herein in both his individual and official capacities.

12.    That at all times herein mentioned, defendant P.O. Lisaura Messa (hereinafter, "Messa") was and is an NYPD officer employed by defendant City.

13.    Upon information and belief, defendant Messa also goes by the name Lisaura Skladel.

FIRST AMENDED COMPLAINT - 2

14.     That at all times herein mentioned, defendant Messa was acting within the course and scope of her employment with defendant City.

15.     That at all times herein mentioned, defendant Messa was acting under color of state law.

16.     That defendant Messa is sued herein in both her individual and official capacities.

17.     That at all times herein mentioned, defendant Lt. Brian Kenny (hereinafter, "Kenny") was and is an NYPD officer employed by defendant City.

18.     That at all times herein mentioned, defendant Kenny was acting within the course and scope of his employment with defendant City.

19.     That at all times herein mentioned, defendant Kenny was acting under color of state law.

20.     Defendant Kenny is sued herein in both his individual and official capacities.

21.     That at all times herein mentioned, defendant Det. John Hachadoorian (hereinafter, "Hachadoorian") was and is an NYPD officer employed by defendant City.

22.     That at all times herein mentioned, defendant Hachadoorian was acting within the course and scope of his employment with defendant City.

23.     That at all times herein mentioned, defendant Hachadoorian was acting under color of state law.

24.     Defendant Hachadoorian is sued herein in both his individual and official capacities.

25.     That at all times herein mentioned, defendant Det. Ronald Buell (hereinafter, "Buell") was and is an NYPD officer employed by defendant City.

26.     That at all times herein mentioned, defendant Buell was acting within the course and scope of his employment with defendant City.

27.     That at all times herein mentioned, defendant Buell was acting under color of state law.

28.     Defendant Buell is sued herein in both his individual and official capacities.

29.     That at all times herein mentioned, defendants John/Jane Does 1 through 10 (hereinafter, "Does 1-10") were and are NYPD personnel employed by defendant City.

30.     That at all times herein mentioned, defendants Does 1-10 were acting within the course and scope of their employment with defendant City.

31.     That at all times herein mentioned, defendants Does 1-10 were acting under color of state law.

32.     The names "John Does 1 through 10" are fictitious, as these defendants' true names are presently unknown.

33.     These defendants are intended to be the law enforcement personnel involved in the stops, detentions, arrests, imprisonments, and prosecutions of plaintiff.

34.     That defendants Does 1-10 are sued herein in both their individual and official capacities.

35.     That at all times herein mentioned, defendant City was under an obligation to use reasonable care in the hiring, training, retention, and supervision of its employees, including, without limitation, defendants Assencao, Messa, Kenny, Hachadoorian, Buell,  and Does 1-10 .

36.     At all relevant times herein, the individual defendants acted jointly and in concert with each other.

FIRST AMENDED COMPLAINT - 4

37.     Each individual defendant had the duty and the opportunity to protect plaintiff from the unlawful actions of the other individual defendants, but each individual defendant failed and refused to perform such duty, thereby proximately causing plaintiff's injuries.

## **FACTUAL BACKROUND**

38.     The facts stated in this complaint are based, <u>inter</u> <u>alia</u>, on the personal knowledge of plaintiff Nathaniel Isaac regarding events in which he was directly involved and upon information and belief. The sources of "information and belief" factual statements are primarily documents from the underlying criminal prosecution and related public documents which are currently available to plaintiff. Those sources are incomplete, particularly, without limitation, as to numerous documents and court exhibits. This complaint is drawn without the benefit of full discovery proceedings.

## **PLAINTIFF'S FIRST ARREST AND ARRAIGNMENT**

39.     Around 7:50 p.m. on May 27, 2008, Gagan Kharbanda and George Stefas, both of whom worked for a company named Venus Auto Parts located at 39-11 22nd Street in Long Island City, Queens, New York, were standing outside their business on 22nd Street between 39th and 40th Avenues when they observed two boxes fall from the roof of 39-40 22nd Street – a industrial warehouse that was across the street and up the block from where Kharbanda and Stefas were standing.

40.     Kharbanda and Stefas then observed a person sliding down a pole on the side of the building to the street.  Upon reaching the street level, that person ran away.  The boxes were left in front of the building.

41.     Kharbanda called 911 and reported what he observed.  He told the 911 operator that the male who came off the roof was a 40 year old black male, and that after coming off the roof, the male went down 22nd Street toward 40th Avenue, and made a right onto 40th Avenue.

42.     Around that time, a marked police car belonging to Officers Assencao and Messa of the NYPD's PSA 9 precinct was parked at a vehicle repair shop at the corner of 39th Avenue and 22nd Street, where the officers were putting air into one of the car's tires.

43.     Once the officers had finished putting air into the tire, they began driving south on 22nd Street, toward 40th Avenue.   About halfway down the block, Officers Assencao and Mesa were flagged down by George Stefas.   At the same time they were being flagged down, the information provided to 911 by Steffas and Kharbanda – including the description of the person they had observed – was being transmitted over the police radio, and was heard by Assencao and Messa.

44.     When the officers pulled over, Stefas and Kharbanda told the officers the same information they had communicated to 911.

45.     In addition to Stefas, Kharbanda, and Officers Messa and Assencao, there were several other people on the block.   One of those individuals was plaintiff, who, at that time, was about 100 feet away, walking on 22nd Street toward 39th Avenue – the completely opposite direction from where the officers had been told that the man on the roof had gone.

46.     Other than being a black male, plaintiff did not match the description that was given to 911 by Stefas and Kharbanda and that was relayed by the 911 dispatcher over the police radio – a radio transmission that Assencao and Messa heard.   Nor did plaintiff match the description that Stefas and Kharbanda gave to Assencao and Messa in person.

47.     Despite knowing that plaintiff did not match the description, that plaintiff was nowhere near the area where Stefas and Kharbanda had said the person on the roof had fled to, and that plaintiff was nowhere near the boxes in front of the building, P.O.s Assencao and Messa nevertheless drove their police car to where plaintiff was walking, stopped him for no

FIRST AMENDED COMPLAINT - 6

1    reason whatsoever and without any legal basis, and immediately handcuffed him placed

2    plaintiff into the police car.

3          48.    At the time that plaintiff was stopped by Officers Assencao and Messa, he was

4    carrying nothing other than a small bag containing plaintiff's personal effects.

5          49.    Upon information and belief, during this time, Lt. Kenny, who was the

6    supervisor of Officers Assencao and Messa, arrived at the scene, and Stefas and Kharbanda told

7    him the same information they had communicated to 911 and to Officers Assencao and Messa.

8          50.     Lt. Kenny observed that plaintiff did not match the description that he had heard

9    relayed by the 911 dispatcher over the police radio, and that plaintiff did not match the

10   description that Stefas and Kharbanda gave to Kenny in person.  Nevertheless, Kenny permitted

11   Assencao and Messa to detain plaintiff without legal basis.

12         51.    P.O. Assencao thereafter called the fire department for a ladder and he and

13   Kenny climbed up on the roof to investigate.  While Assencao and Kenny went up to the roof,

14   Officer Messa remained in the police car with plaintiff, who was still handcuffed, and stood

15   guard over him.

16         52.    Additionally, the NYPD's Emergency Services Unit ("ESU") responded to the

17   scene, and multiple police officers from that unit thoroughly investigated the rooftop for any

18   sign of burglary or other offenses.  They found nothing of the sort, and they relayed that

19   information to Officers Assencao and Messa and Lt. Kenny.

20         53.    Upon investigating the rooftop themselves, neither P.O. Assencao not Lt. Kenny

21   saw no signs of any forced entry into that building or the adjoining buildings, or any property

22   damage whatsoever.

FIRST AMENDED COMPLAINT - 7

54.     After investigating the roof and finding nothing, Officers Assencao and Messa arrested plaintiff for trespassing.  Lt. Kenny, as Assencao and Messa's supervisor, authorized the arrest.  P.O. Assencao also vouchered the two boxes of shoes as investigatory evidence.

55.     Later that day, or early on May 28, 2008, P.O. Assencao spoke with Assistant District Attorney Richard Giordano of the Queens County District Attorney's Office and told him that there were no signs of forced entry at the building or at any of the adjoining properties.

56.     P.O. Assencao told the ADA that when he stopped plaintiff, plaintiff was pushing a shopping cart.  This statement was false and fabricated. Upon information and belief, this representation was given by Assencao in order to make it appear that his and Messa's stop and arrest of plaintiff was justified when in fact it was known to them to be illegal and baseless.  Upon information and belief, one of the civilian witnesses stated that the person who came off the room was pushing a shopping cart.  In actuality, plaintiff had never been pushing a shopping cart at any time on May 27, 2008, and Assencao's fabricated account to the contrary was given simply to ensure plaintiff's prosecution and to manufacture a basis by which the Assistant District Attorney could "connect the dots" between the person who Kharbanda and Stefas saw come off the roof (i.e., the person who walked to 40th Avenue and turned the corner) and the person Assencao and Messa thereafter arrested (i.e., plaintiff), even though they were not the same person.

57.     P.O. Assencao also told ADA Giordano that he had personally observed plaintiff carrying the two boxes of women's shoes, and that Kharbanda and Stefas had observed plaintiff throwing the boxes off the roof.   These representations were fabricated and false.

FIRST AMENDED COMPLAINT - 8

58.     Assencao also told the prosecutors that Stefas and Kharbanda had pointed to plaintiff and identified him as the person who they had observed on the roof of the building. This was fabricated and false.

59.     In fact, there was no point out or any other sort of identification of plaintiff ever conducted.

60.     Throughout plaintiff's prosecution, Officer Assencao told the prosecutors that, other than Stefas and Kharbanda, plaintiff was the only other person on the block.  This was fabricated and false.

61.     Assencao also lied when he told the prosecutors that he had arrested plaintiff only after he had investigated the rooftops for signs of burglary (and found none).  In fact, plaintiff had been arrested, searched, handcuffed, and placed in a police vehicle immediately upon being stopped by Assencao and Messa, without any identification procedure first being conducted, and despite the fact that he did not match the description given by Stefas and Kharbanda of the person who they observed on the rooftop.  Additionally, P.O. Assencao did not speak to any representative of the building on whose rooftop plaintiff was supposedly observed until the day after plaintiff's arrest.

62.     Upon information and belief, Officer Assencao lied to the District Attorney's Office about what he observed and what took place in order to make the prosecutors believe that the arrest had been proper, and thereby to eliminate the prospect of the prosecutors declining to prosecute the case because the arrest had been illegal.  A "decline to prosecute," or "DP," would have been a blight on Assencao, Messa, and Kenny's records, and to their precinct in general.

63.     P.O. Messa and Lt. Kenny knew that the many statements provided by P.O. Assencao to ADA Giordano and other prosecutors at the District Attorney's Office throughout

plaintiff's prosecution were untrue and fabricated, but they nevertheless took no steps to correct the false statements, or to intervene to prevent Assencao's continued fabrication and manufacturing of evidence, or to prevent the improper, unlawful, and unconstitutional arrest, prosecution, conviction, and incarceration of plaintiff, despite the fact that they had ample opportunity to do so.

64.    Plaintiff thereafter was arraigned on Queens County Criminal Court Docket 2008QN028980, which charged him with one count of Criminal Trespass in the Third Degree (PL § 140.10[a]). A class B misdemeanor.

65.    The allegations in that Criminal Court complaint came from P.O. Assencao, who was the deponent in that complaint, and who signed the complaint under penalty of perjury, and Officer Messa.  In that complaint, Assencao alleged that on May 27, 2008,  Georgiof "George" Stefas observed plaintiff "on the roof" of the building located at 39-40 22nd Street, and that plaintiff "thr[e]w two boxes to the ground" before coming down off the roof.  The complaint further alleged that the two boxes contained 12 pairs of women's shoes, and that Police Officer Assencao recovered these two boxes from plaintiff.

66.    All of these allegations, which were based on information that Assencao had relayed to the District Attorney's Office, were fabricated and false.

67.    Lt. Kenny approved of the complaint before Officer Assencao signed it, and approved of Assencao signing it and transmitting it to the District Attorney's Office, knowing full well that its contents were false and that it would lead to the arraignment and unlawful prosecution of plaintiff.

68.    Despite knowing that Officers Assencao and Messa were transmitting false and fabricated information to the District Attorney's Office, Lt. Kenny took no steps to correct the

FIRST AMENDED COMPLAINT - 10

false statements, and took no steps to discipline, train, or otherwise supervise Assencao and Messa, and tookm no steps to prevent Assencao and Messa from fabricating allegations and manufacturing of evidence in the case against plaintiff.

69.     And despite having been aware of Kenny's propensity for falsifying evidence, defendant City took no steps to discipline, train, or otherwise supervise Kenny to ensure against his continued fabrications and to prevent against the unlawful arrest, prosecution, and conviction of plaintiff, an innocent man.

70.     Plaintiff pleaded not guilty at arraignment and bail was set at $1,000 insurance bond.

71.     Plaintiff was thereafter released from NYC DOC's custody on June 2, 2008, the CPL § 170.70 day, because the People had failed to convert the complaint into an information.

**PLAINTIFF'S SECOND ARREST AND ARRAIGNMENT**

72.     On May 29, 2008, Paoling Hsia, the owner of the building located at 39-35 21st Street, which was one of the buildings adjacent to the building located at 39-40 22nd Street and which housed a company owned by Hsia named Forenzi Incorporated, returned to the building after a six-day absence.  While the front door to the building was locked and undamaged, Ms. Hsia discovered that one of the second-floor windows was broken and bricks that had kept the window frame and metal security gate in place had been removed and left on the roof outside the window.

73.     Notably, the Forenzi Incorporated building was one of the buildings that Officer Assencao and the NYPD's ESU team had investigated and examined when they went up to the roof on May 27, 2008.  On that date, none of the officers who investigated the rooftops,

FIRST AMENDED COMPLAINT - 11

1    including Assencao, had seen any evidence of property damage, forced entry, burglary, or the

2    like to Ms. Hsia's building.

3          74.    Upon her return to her building on May 29, 2008, Hsia noted that eight of the ten

4    cartons of boots that had been stored in the second floor were missing, as was a circular saw, a

5    compressor, and a 70- to 100-pound generator that had been near the front entrance.

6          75.    Hsia reported the incident to the police, and the case was assigned to Detective

7    John Hachadoorian of the NYPD's 114th Precinct's Detective Squad.

8          76.    On June 19, 2008, Det. Hachadoorian met with Paoling Hsia and showed her the

9    two boxes of shoes that had been vouchered by P.O. Assencao in connection with plaintiff's

10   May 27, 2008 arrest.

11         77.    Ms. Hsia, however, could not definitively identify the shoes as those that

12   allegedly had been taken from her warehouse.

13         78.    After interviewing Ms. Hsia, Det. Hachadoorian concluded that it was only

14   "possible" that the boxes of shoes that were recovered from in front of 39-40 22nd Street on May

15   27, 2008 belonged to Ms. Hsia and were taken during the time her warehouse was burglarized.

16   This conclusion was confirmed by Det. Hachadoorian's supervisor, Det. Ronald Buell, who

17   reviewed all of Det. Hachadoorian's DD5 follow-up investigation reports, in which his

18   investigative steps were documented.

19         79.    On June 24, 2008, Det. Hachadoorian interviewed Gagan Kharbanda.   Mr.

20   Kharbanda told Det. Hachadoorian that on May 27, 2008, he was in front of 39-11 22nd Street

21   with George Stefas, a co-worker, when he "heard a loud noise and then observed a large

22   cardboard box on the sidewalk," and "a moment later he observed a second large cardboard box

23   come off the roof of the building.   Kharbanda told Det. Hachadoorian that he thereafter

FIRST AMENDED COMPLAINT - 12

observed a male on the rooftop, at which time he called 911.  Kharbanda then saw the male climb down from the rooftop and begin running away.  After that, Kharbanda was "stopped by the police on the corner of 22nd Street and 39th Avenue" and asked to describe the male he had observed on the rooftop, which he did.  Upon information and belief, the description given by Kharbanda did not match plaintiff at all, with the exception of the fact that both plaintiff and the person observed on the roof of the building were black males.

80.     Det. Hachadoorian recorded in his follow-up investigation reports that Kharbanda told him that the person who Officers Assencao and Messa stopped on March 27, 2008 was the same male he had observed on the rooftop, and the same male who had pushed the boxes off the rooftop.  These statements by Det. Hachadoorian were fabricated and false.

81.     Det. Buell knew that these statements were untrue and fabricated, but he nevertheless approved of their inclusion in Det. Hachadoorian's notes, took no steps to correct the false statements, took no steps to alert the District Attorney's Office, the court, or plaintiff of their falsity, and took no steps to discipline, train, or otherwise supervise Hachadoorian or to ensure against Hachadoorian's continued fabrication of allegations and manufacturing of evidence.

82.     Despite knowing that Kharbanda had called 911, Det. Hachadoorian, Det. Buell, Officer Assencao, Officer Messa, Lt. Kenny, and Does 1-10 each failed and/or refused to take the necessary steps to review and preserve the recordings of the 911 calls and all related radio transmissions.  No copy of those recordings was ever provided to plaintiff before they were destroyed.

83.     In addition to failing to turn over the recordings of the 911 calls and police radio transmissions, Det. Hachadoorian, Det. Buell, Officer Assencao, Officer Messa, Lt. Kenny, and

Does 1-10 also failed/refused to turn over to the prosecution and defense the records created by NYPD ESU officers in connection with their search and investigation of the rooftops on or about May 27, 2008.  These items were withheld by defendants despite the fact that they contained exculpatory information and information that negated any probable cause that plaintiff had committed the offenses with which he was charged.

84.    No video surveillance or forensic evidence connected plaintiff to the damage to the Forenzi Incorporated window, the burglary, or to the property that allegedly had been stolen. In fact, none of the allegedly stolen property was ever recovered.

85.    On June 25, 2008, based on fabricated information created by defendants Assencao, Messa, Kenny, Hachadoorian, Buell, and Does 1-10, plaintiff was arrested at his residence in Kings County and charged, under Queens County Criminal Court Docket Number 2008QN034794 with one count each of Burglary in the Third Degree (PL § 140.20), Criminal Mischief in the Third Degree (PL § 145.05), and Criminal Possession of Stolen Property in the Fourth Degree (PL § 165.45[1]).

86.    There was no legal basis for this arrest and prosecution whatsoever, and the defendants herein all believed that, at best, there was no better than a "possibility" that "the boxes of shoes recovered from in front of 39-40 22nd Street on May 27, 2008 had been taken during the time Hsia's warehouse was burglarized.  There was no legitimate basis to believe that plaintiff had burglarized the premises, damaged the premises in any way, or possessed stolen property.

87.    The allegations in the second Criminal Court complaint came from Detective John Hachadoorian, who was the deponent of that complaint, and who signed the complaint under penalty of perjury, under the review and approval of his supervisor, Det. Buell.

FIRST AMENDED COMPLAINT - 14

88.     In that complaint, Hachadoorian stated under oath that the building located at 39-35 21st Street, which was adjacent to the building located at 39-40 22nd Street, housed a company named Forenzi Incorporated.  The Complaint further alleged that, on May 29, 2008, a woman named Paoling Hsia, who owned Forenzi Incorporated and its building, "observed that the fence on the roof of 39-40 22nd Street had been dislodged from a post and pulled aside," and that a metal window frame on a second story window of the Forenzi Incorporated building had been removed, that the glass of the window had been broken, and that the brick surrounding the window had been damaged.

89.     That complaint also alleged that "one generator, one compressor, one circular saw, and an unknown quantity of shoes" were discovered to be missing from inside the Forenzi Incorporated building, and that when Ms. Hsia had "last left [the building] on May 23, 2008, that property "was inside said location," and that the "fence and window were undamaged."

90.     The allegations that on or after May 29, 2008, Hsia had "observed that the fence on the roof of 39-40 22nd Street had been dislodged from a post and pulled aside," and that when Ms. Hsia had "last left [the building] on May 23, 2008," the fence was "undamaged" were fabricated and false.

91.     The second Criminal Court complaint additionally alleged that Hachadoorian had been informed by Gargan Kharbanda that on May 27, 2008, Kharbanda observed plaintiff throw two boxes off the roof of 39-40 22nd Street, and then "jump down" from the roof and "flee said location with said two boxes."  These allegations, as well, were false and fabricated.

92.     The Criminal Court complaint further alleged that Det. Hachadoorian was informed by P.O. Assencao that Assencao had recovered these boxes, each of which

FIRST AMENDED COMPLAINT - 15

"contain[ed] twenty-four (24) pair of shoes," from plaintiff's person.  These allegations, as well, were false and fabricated.

93.     Hachadoorian and Buell knew that all of these allegations were false and fabricated, yet Hachadoorian nevertheless swore to their veracity in the complaint, thereby perjuring himself, and Buell approved of this and permitted Hachadoorian to do so.

94.     Det. Buell reviewed the complaint before Det. Hachadoorian signed it and sent it the prosecutor, and although Det. Buell knew that several material allegations in the complaint were fabricated and false, he nevertheless approved of their inclusion in Det. Hachadoorian's complaint.  Buell took no steps to correct the false statements, took no steps to inform the District Attorney's Office, the court, or plaintiff of the falsity of the allegations being lodged against plaintiff, and instead concealed and suppressed the truth.

95.     And despite having been aware of Hachadoorian's propensity for falsifying evidence, defendants – including Hachadoorian's supervisor, Det. Buell – took no steps to discipline, train, or otherwise supervise Hachadoorian to ensure against his continued fabrications and to prevent against the unlawful arrest, prosecution, and conviction of plaintiff, an innocent man.

96.     And despite having been aware of Buell's propensity for falsifying evidence, defendant City took no steps to discipline, train, or otherwise supervise Buell to ensure against his continued fabrications and to prevent against the unlawful arrest, prosecution, and conviction of plaintiff, an innocent man.

97.     Plaintiff pleaded not guilty to the charges under Criminal Court Docket Number 2008QN034794 and bail was set at $50,000 insurance bond over $25,000 cash.

98.     As plaintiff could not afford to pay the bail, he remained incarcerated.

FIRST AMENDED COMPLAINT - 16

## THE INDICTMENT OF PLAINTIFF

99.     The District Attorney's Office thereafter presented the burglary case against plaintiff to the Grand Jury, and in connection with that presentation, upon information and belief, defendants, including P.O. Assencao and Det. Hachadoorian, testified.

100.     The police witnesses in the Grand Jury, including defendants herein, presented fabricated and false testimony and suppressed and concealed the truth in an effort to secure plaintiff's indictment at all costs.

101.     In his testimony, P.O. Assencao told the grand jurors that, on May 27, 2008, at the corner of 39th Avenue and 22nd Street in Queens, NY, a "complainant" had "indicated" to him that plaintiff "had tossed those boxes [of women's shoes] off the roof of the building" located at 39-40 22nd Street.

102.     This testimony was false and fabricated.

103.     P.O. Assencao also testified that when he stopped plaintiff, that plaintiff was pushing a shopping cart.

104.     This testimony was false and fabricated.

105.     Upon information and belief, this testimony was given by Assencao in order to conform his testimony to that of one of the civilian witnesses who, upon information and belief, testified that the person who came off the room was pushing a shopping cart.  In actuality, plaintiff had never been pushing a shopping cart at any time on May 27, 2008, and Assencao's perjured testimony to the contrary was given to ensure plaintiff's indictment and to manufacture a basis by which the Grand Jurors could to "connect the dots" between the person who Kharbanda and Stefas saw come off the roof (i.e., the person who walked to 40th Avenue and

turned the corner) and the person the officers thereafter arrested (i.e., plaintiff), even though they were not the same person.

106.    P.O. Assencao further testified that after he stopped plaintiff, plaintiff admitted to him that, prior to the officers' arrival, he had been "looking at" the boxes of women's shoes.

107.    This testimony was also false and fabricated.

108.    P.O. Assencao also testified that when he went onto the rooftop of 39-40 22nd Street on May 27, 2008 to investigate for signs of burglary to that building and the adjoining buildings, he observed that a portion of the fence separating the building located at 39-40 22nd Street from the building located at 39-35 21st Street (the building that was burglarized) was peeled up in the corner.

109.    This testimony was false and fabricated.

110.    Assencao also deliberately withheld from the Grand Jury the fact that on May 27, 2008, he, Kenny, and an entire ESU team had scoured the rooftop of the building that plaintiff was alleged to have been on, as well as the adjoining buildings, and that none of them had seen any signs of any forced entry into that building or the adjoining buildings, any signs of burglary, or any property damage whatsoever.

111.    Assencao also withheld the fact that the description given to him by Stefas and Kharbanda of the person observed on the rooftop, as well as the 911 radio transmission he heard regarding that individual, did not match plaintiff.

112.    Upon information and belief, Detective Hachadoorian repeated to the Grand Jury the false and fabricated allegations that he had included in the Criminal Court complaint, that he had forwarded to the District Attorney, and which formed the basis of plaintiff's arrest and prosecution under Criminal Court Docket Number 2008QN034794.

FIRST AMENDED COMPLAINT - 18

113.   Upon information and belief, defendants Assencao, Messa, Kenny, Hachadoorian, and Buell consciously disregarded known and excessive risks to plaintiff's liberty and welfare and engaged in a pattern of behavior and conduct in furtherance of securing and sustaining an unjust conviction against plaintiff, including but not limited to engaging in a pattern and course of conduct of intimidation, threats, and deceit whereby these defendants failed to disclose material exculpatory and/or impeaching evidence before, during, and after the grand jury presentation in plaintiff's criminal case, they fabricated evidence, testified falsely, told witnesses what to say, and intimidated and pressured witnesses to testify falsely in the grand jury, that, inter alia: plaintiff was on the rooftop of  39-40 22nd Street on May 27, 2008; that he threw boxes off the roof of that building; that he thereafter climbed off the building and fled with the boxes; that the boxes were recovered from plaintiff; that plaintiff admitted to having looked at and/or possessed those boxes; and that the fence separating the rooftops of 39-40 22nd Street and 39-35 21st Street was in good repair and undamaged prior to May 23, 2008.

114.   Additionally, upon information and belief, all defendants cultivated the civilian witnesses in the Grand Jury to testify falsely and to suppress the truth through a campaign of pressure, deceit, and intimidation.

115.   Based on defendants' false and fraudulent testimony in the Grand Jury, their suborning of perjurious testimony from civilian witnesses, and defendants' concealment from the Grand Jury of material exculpatory facts, plaintiff was thereafter indicted under Queens County Indictment Number 1630/08, which charged him with Burglary in the Third Degree, Criminal Mischief in the Fourth Degree, Trespass in the Third Degree, and Criminal Possession of Stolen Property in the Fifth Degree.

FIRST AMENDED COMPLAINT - 19

116.     Upon information and belief, this indictment would not have been voted were it not for defendants' fraud, perjury, and suppression of evidence.

117.     At plaintiff's arraignment on the indictment, he pleaded not guilty to all counts.

118.     Plaintiff declined any plea offers and consistently maintained his innocence.

119.     All defendants were aware that Assencao, Messa, and Hachadorian's statements to the District Attorney's Office and the Grand Jury were untrue, as were those of Kenny and Buell, but none of them took any steps to correct the false statements, to intervene in order to prevent those officers' continued fabrication of false statements and manufacture of evidence, or to inform the District Attorney's Office, the court, or plaintiff of the falsity of the allegations being lodged against plaintiff.  Instead, all defendants affirmatively concealed their wrongdoing and suppressed the truth.

120.     And despite having been aware of defendants Assencao, Messa, and Hachadoorian's propensities for lying, falsifying evidence, and concealing the truth, defendants Kenny, Buell, and City, took no steps to discipline, train, or otherwise supervise those officers to ensure against their continued fabrications and to prevent against the continued unlawful prosecution, detention, and conviction of plaintiff, an innocent man.

## **PLAINTIFF'S TRIAL**

121.     By July of 2010, plaintiff had spent more than two continuous years of pretrial detention in the New York City Department of Correction custody.

122.     At any point during this period, had any of defendants revealed to plaintiff, the court, or the prosecution that defendants had fabricated evidence, falsified testimony, cultivated witnesses to testify falsely, and manufactured out of whole cloth the case against plaintiff, the charges against plaintiff would have been dropped and the indictment dismissed.

FIRST AMENDED COMPLAINT - 20

123.    Had any of defendants revealed even some of the concealed truths to plaintiff, the court, or the prosecution, the criminal case against plaintiff would have been dismissed, or, at a minimum, plaintiff would have been released from custody or bail would have been substantially lowered to an amount he could post so that he would have been able to gain release.

124.    Instead, defendants maintained their pact of silence, continued to suppress the truth, and perpetuated their falsified version of events.

125.    In July of 2010, plaintiff proceeded to a nonjury trial before the Hon. Stephen Knopf in New York State Supreme Court.

126.    In plaintiff's pre-trial motion for new counsel, the trial court, without giving plaintiff the option of proceeding with his current attorney or proceeding pro se, and without warning him of the dangers of self-representation, declared that plaintiff had forfeited his right to counsel and ordered him to proceed pro se.  Thus, although plaintiff never waived his right to counsel, the court forced him to proceed to trial without the benefit of counsel.

127.    At trial, the People adduced evidence that the police learned that at some point between May 23, 2008, and May 27, 2008, a break-in had occurred at a warehouse adjacent to the building near which plaintiff had been seen on May 27, 2008.

128.    The People also called Gagan Kharbanda at trial.  Before Kharbanda took the stand, plaintiff moved to preclude Kharbanda's testimony on the basis that Kharbanda had called 911 in connection with observing a male on the roof of 39-40 22nd Street, but that the People had never turned over the 911 recording, and had permitted it to be destroyed.  The court denied plaintiff's motion.

FIRST AMENDED COMPLAINT - 21

129.   In addition to failing to turn over the recordings of the 911 calls and police radio transmissions, defendants also failed/refused to turn over to the prosecution and defense the records created by NYPD ESU officers in connection with their search and investigation of the rooftops on or about May 27, 2008.  These items were withheld by defendants despite the fact that they contained exculpatory information and information that negated any probable cause that plaintiff had committed the offenses with which he was charged.

130.   Defendants withheld these items before, during, and after plaintiff's criminal trial. Had any of defendants disclosed these materials to plaintiff, the court, or the prosecution at any point, the criminal case against plaintiff would have been dismissed, his conviction reversed, or, at a minimum, plaintiff would have been released from custody or bail would have been substantially lowered to an amount he could post so that he would have been able to gain release.

131.   When Kharbanda was asked to look around the courtroom and tell the prosecutor if he saw the person who he had observed on the rooftop on the evening of May 27, 2008, Kharbanda stated that he did not recognize plaintiff as the man he had seen on the roof.

132.   At the trial, the People conceded that the break in did not occur on May 27, 2008.  In fact, the People conceded that they had not established – and were not even "suggesting" – that the damage to the warehouse occurred on May 27, 2008, the day that plaintiff was seen near the building adjacent to the warehouse.

133.   The People also put on no evidence that plaintiff had ever damaged the warehouse or entered it.  There also was no evidence that plaintiff had ever been in the vicinity of the complainant's warehouse at any time other than May 27, 2008, nor any evidence that

1    plaintiff ever possessed the generator, compressor, circular saw, and cartons of boots that had

2    been stolen from the warehouse and not recovered.

3         134.   No video surveillance footage, DNA evidence, fingerprint evidence, or other

4    forensic evidence connected plaintiff to any of the charged crimes.

5         135.   At trial, Paoling Hsia testified that on May 29, 2008, she observed that the fence

6    on the roof of 39-40 22nd Street was dislodged from a post and pulled aside; and that when she

7    had last observed the fence on May 22, 2008, it was undamaged.  This was not truthful

8    testimony, and Hsia only testified this way due to defendants' pressure, deceit, and intimidation.

9    Indeed, upon information and belief, Ms. Hsia later admitted that the police had told her what to

10   say in both the Grand Jury and at trial.  Defendants all knew that Hsia's testimony was untrue,

11   yet they took no steps to correct it or bring the falsehoods to light.

12        136.   Gagan Kharbanda testified at trial that on May 27, 2008, he had observed a

13   person on the rooftop of 39-40 22nd Street, and that he saw that person throw boxes off the roof

14   of that building.  According to Kharbanda, that person thereafter climbed off the building and

15   fled with the boxes in a shopping cart, but later returned and placed the boxes he had taken in

16   front of 39-40 22nd Street.  Kharbanda stated that after police arrived at the scene, he pointed out

17   to them the person he had observed on the roof.  This testimony was not true, as Kharbanda

18   never pointed out anyone to defendants Messa and Assencao or any other officer, since the

19   person they had observed had fled down 22nd Street and turned the corner at 40th Avenue, and

20   was no longer on 2nd Street.  Kharbanda's perjurious testimony was the result of defendants'

21   pressure, threats, deceit, and intimidation, which defendants engaged in to secure a conviction

22   of plaintiff at all costs, irrespective of plaintiff's innocence.

FIRST AMENDED COMPLAINT - 23

137.    Officer Assencao testified that upon his arrival at the scene, Kharbanda told him what he had observed and pointed out plaintiff as the person he had observed on the roof.  This was false and fabricated testimony, as neither Kharbanda nor Stefas pointed out plaintiff as the person who had been on the roof.  Assencao also testified that plaintiff was pushing a shopping cart when the officers stopped him.  This was also false and fabricated testimony.   Assencao testified further that plaintiff was the only other person on the street at the time.  This was false and fabricated testimony.  And, Assencao testified that when, on May 27, 2008, he investigated the rooftop for signs of burglary, he observed that a portion of the fence separating the roof of 39-40 22nd Street from the roof of 39-35 21st Street was peeled up in the corner.  This was false and fabricated testimony – in fact, neither Assencao nor any of the other officers who went up to the rooftop that day had seen any signs of burglary, property damage, or forced entry anywhere.

138.    On July 21, 2010, after the close of the People's evidence at trial, the court dismissed the trespass count on the basis that there was no evidence adduced at trial that plaintiff was on property without permission or authority of the property's owner, and the prosecutor agreed that the People had put on no such evidence.

139.    The court also acknowledged that there was "no direct evidence that plaintiff at anytime actually entered or remained in that building of Paoling Hsia with intent to commit a crime therein," no direct evidence of when the allegedly stolen property was actually taken, "no direct evidence of the defendant actually entering the premises or actually taking the property inside," and "no direct evidence that the defendant actually damaged the fence or the window" of the allegedly burglarized building.

FIRST AMENDED COMPLAINT - 24

140.   Upon information and belief, defendants Assencao, Messa, Kenny, Hachadoorian, and Buell consciously disregarded known and excessive risks to plaintiff's liberty and welfare and engaged in a pattern of behavior and conduct in furtherance of securing and sustaining an unjust conviction against plaintiff, including but not limited to engaging in a pattern and course of conduct of intimidation, threats, and deceit whereby these defendants failed to disclose material exculpatory and/or impeaching evidence before, during, and after the trial in plaintiff's criminal case, they fabricated evidence, and they intimidated and pressured witnesses to testify falsely at trial, that, inter alia: plaintiff was on the rooftop of  39-40 22nd Street on May 27, 2008; that he threw boxes off the roof of that building; that he thereafter climbed off the building and fled with the boxes in a shopping cart; that Kharbanda and/or Stefas pointed out to the officers the person he had observed on the roof; that the person to whom Kharbanda and/or Stefas pointed was plaintiff; that plaintiff was pushing a shopping cart when the officers stopped him; that the boxes were recovered from plaintiff; that plaintiff admitted to having looked at and/or possessed those boxes; that when, on May 27, 2008, Officer Assencao investigated the rooftop for signs of burglary, he observed that a portion of the fence separating the roof of the building located at 39-40 22nd Street from the roof of the building located at 39-35 21st Street was peeled up in the corner; that on or after May 29, 2008, Paoling Hsia observed that the fence on the roof of 39-40 22nd Street was dislodged from a post and pulled aside; and that when Ms. Hsia had last observed the fence on May 22, 2008, it was undamaged.

141.   By doing the aforementioned, defendants perjured themselves, suborned perjurious testimony, fabricated evidence against plaintiff, and suppressed the truth.

142.   Defendants also failed to secure, failed to preserve, and failed to disclose the recordings of Stefas and Kharbanda's 911 calls and the ensuing police radio transmissions, as well as the ESU police records documenting their investigation of the rooftops on or about May 27, 2008, despite knowing that these recordings and documents were material and exculpatory, and despite their unwavering duty to preserve all evidence relevant to plaintiff's criminal case.

143.   Nevertheless, on July 21, 2010, the court convicted plaintiff of one count each of third-degree burglary (P.L. § 140.20), fourth-degree criminal mischief (P.L. § 145.00[1]), and fifth-degree criminal possession of stolen property (P.L. § 165.40).

144.   On August 4, 2010, plaintiff filed with the court a pro se motion pursuant to CPL § 330.30 to set aside the verdict.

145.   Despite the fact that Judge Knopf lacked the authority to reweigh the factual evidence and reconsider the verdict, see People v. Carter, 63 N.Y.2d 530, 533 (1984) (a "[t]rial [j]udge who has rendered a guilty verdict after a nonjury trial has neither inherent power nor statutory authority, to reconsider his factual determination"); People v. Maharaj, 89 N.Y.2d 997, 999 (1997) ("[a]fter formal rendition of a verdict at a bench trial, a trial court lacks authority to reweigh the factual evidence and reconsider the verdict"), he nevertheless denied the motion and adjourned the matter to September 8, 2010 for sentencing.

146.   On September 8, 2010, over plaintiff's repeated protestations of innocence, the court sentenced plaintiff to 3 ½ to 7 years in state prison for the burglary to run concurrently with one year definite sentences on the criminal mischief and criminal possession of stolen property counts.

FIRST AMENDED COMPLAINT - 26

1

## **PLAINTIFF'S APPEAL**

2      147.    Plaintiff thereafter appealed his criminal convictions to the Appellate Division,

3  Second Department.

4      148.    On October 8, 2014, the Appellate Division, Second Department issued a

5  Decision and Order reversing plaintiff's judgment of conviction, dismissing the indictment, and

6  remitting the matter to Supreme Court, Queens County, for further proceedings consistent with

7  CPL § 160.50.

8      149.    In its Decision and Order, the Second Department held, in relevant part:

9              "[A]s the defendant correctly contends in his main brief, the

10             People failed to adduce legally sufficient evidence of his guilt with

11             respect to the burglary and criminal mischief counts. In particular,

12             the People adduced no proof as to, inter alia, the time of the

13             burglary that formed the basis of those counts.   Rather, the

14             evidence showed only that those events occurred at some point

15             during a four-day period prior to the apprehension of the defendant.

16             The evidence showed that the defendant was found in possession

17             of some of the alleged proceeds of the burglary on the date of his

18             apprehension. However, there was no other evidence connecting

19             him to the burglary or the damage to the warehouse, and, under

20             these circumstances, his possession of the alleged burglary

21             proceeds was not shown to be 'recent and exclusive'. Accordingly,

22             the defendant's convictions of burglary in the third degree and

FIRST AMENDED COMPLAINT - 27

1    criminal mischief in the fourth degree must be vacated, and those

2    counts of the indictment must be dismissed."

3  Id. at 817; Exh. Q.

4                    **PLAINTIFF'S RELEASE FROM STATE PRISON**

5    150.   On October 9, 2014, plaintiff was released from NYS DOCCS custody.

6                          **DISMISSAL OF CRIMINAL CASE**

7    151.   On November 7, 2014, the criminal action against plaintiff was dismissed by

8  Supreme Court, Queens County.

9                                    **DAMAGES**

10   152.   This action seeks damages on behalf of plaintiff for the extraordinary emotional

11 pain and suffering, loss of liberty, loss of reputation, humiliation, economic loss, and injuries to

12 his person, that plaintiff was forced to endure as a consequence of defendants' decidedly

13 wrongful actions.

14   153.   Plaintiff did not commit any offenses on May 27, 2008.

15   154.   The conduct of defendants, who acted at all times under color of state law and

16 within the scope of their employment and authority, directly and proximately caused plaintiff to

17 suffer loss of liberty, serious physical and emotional injury, mental anguish, humiliation,

18 embarrassment, and economic loss.

19   155.   Defendants acted with reckless and wanton disregard for the rights of plaintiff.

20   156.   As a result of all of the acts alleged herein, plaintiff suffered and continues to

21 suffer physical and mental pain and anguish, emotional distress, and economic damages.

22

23

FIRST AMENDED COMPLAINT - 28

# CLAIMS

## FIRST CLAIM - AGAINST ALL INDIVIDUAL DEFENDANTS

### (Malicious Prosecution Claim Under 42 U.S.C. § 1983)

157.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

158.    Defendants, acting in concert and within the scope of their employment and authority, caused plaintiff to be prosecuted with malice and without probable cause – a prosecution that terminated in plaintiff's favor – in violation of plaintiff's right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

## SECOND CLAIM – AGAINST ALL INDIVIDUAL DEFENDANTS

### (Malicious Abuse of Process Claim Under 42 U.S.C. § 1983)

159.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

160.    Defendants, acting in concert and within the scope of their employment and authority, employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts.

161.    The purpose of activating the process was intent to harm plaintiff without economic or social excuse or justification.

162.    Defendants were seeking a collateral advantage or corresponding detriment to plaintiff which was outside the legitimate ends of the process.

163.    Such collateral objective included, but was not limited to, pinning the burglary and related crimes on plaintiff in order to close out an open and unsolved felony crime, the closing out of which inured to benefit of those police precincts' stature and statistics under,

FIRST AMENDED COMPLAINT - 29

among other things, the CompStat system, and to give the involved officers and their supervisors another "notch on the belt." Such collateral objective also included, but was not limited to, covering up defendants' illegal actions in knowingly stopping, detaining, searching, and arresting plaintiff without any legal basis, justification, or probable cause.

164.    The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and that by virtue of the aforementioned acts, plaintiff was deprived of his rights, privileges and immunities secured by the Constitution of the United States, including his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable or unlawful searches and seizures and to due process of law.

### THIRD CLAIM - AGAINST ALL INDIVIDUAL DEFENDANTS

### (**Failure to Intervene Claim Under 42 U.S.C. § 1983**)

165.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

166.    Each individual defendant had an affirmative duty to intervene on behalf of plaintiff, whose constitutional rights were being violated in that defendant's presence by other police officers, but failed to intervene to prevent the unlawful conduct, despite having had a realistic opportunity to do so, in violation of plaintiff's right under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

### FOURTH CLAIM - AGAINST ALL INDIVIDUAL DEFENDANTS

### (**Unreasonably Prolonged Detention Claim under 42 U.S.C. § 1983**)

167.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

FIRST AMENDED COMPLAINT - 30

168. Upon information and belief, defendants' above-described conduct, including but not limited to defendants' mishandling of exculpatory and/or impeaching evidence and their concealment, suppression, and/or failure to turn evidence over to the prosecution or the defense, their subornation of perjury, their own perjurious testimony, and their intimidation, threats, coercion, and deceit of witnesses, engaged in under color of state law, violated rights, privileges and immunities secured to plaintiff by the Constitution of the United States of America including, inter alia, plaintiff's Fourth and Fourteenth Amendment right to be free from continued detention after it was or should have been known that plaintiff was entitled to release, as articulated in Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir. 2007).

169. Plaintiff had a right to be free from continued detention stemming from defendants' intimidation and coercion of witnesses, and their mishandling, concealment, and/or suppression of exculpatory and/or impeaching material, and defendants violated that right.

170. That said Constitutional right arises both from plaintiff's Fourth Amendment right to be free of unreasonable searches and seizures and plaintiff's Fourteenth Amendment right to substantive due process.

171. Defendants' conduct in this regard was so egregious and outrageous as to shock the conscience.

**FIFTH CLAIM - AGAINST ALL INDIVIDUAL DEFENDANTS**

**(Denial of Fair Trial / Procedural and Substantive Due Process Under 42 U.S.C. § 1983)**

172. Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

173. By the conduct and actions described above, defendants, under color of state law, conspired to interfere with and violate rights secured to plaintiff by the Constitution of the

FIRST AMENDED COMPLAINT - 31

United States in violation of 42 U.S.C. § 1983, including, but not limited to, plaintiff's Fourth and Fourteenth Amendment rights.

174.    Defendants, through the actions alleged above, consciously disregarded known and excessive risks to plaintiff's liberty and welfare and engaged in a deliberate and unjustified effort to manufacture guilt against plaintiff in furtherance of a plan to secure and sustain a conviction against plaintiff at all costs.

175.    This included a course of conduct and pattern of behavior whereby, upon information and belief, defendants, inter alia, created and fabricated evidence to create the appearance of probable cause, and maliciously concealed and suppressed material exculpatory evidence, suborned perjurious testimony, developed and cultivated witnesses to testify falsely, and unduly and improperly influenced the statements and testimony of witnesses through deceit and other means.

176.    In furtherance of this course of conduct and pattern of behavior, defendants engaged in intimidation, violence, threats, and deceit whereby defendants failed to disclose material exculpatory and/or impeaching evidence before, during, and after plaintiff's trial, fabricated evidence, coerced witnesses, and developed and cultivated witnesses to testify falsely that plaintiff committed offenses and/or crimes.

177.    That such conduct by defendants deprived plaintiff of liberty and constituted both a substantive and procedural due process violation under the Fourteenth Amendment.

178.    Defendants' conduct precipitated and caused the sequence of events that ultimately resulted in the plaintiff's conviction.

179.    Defendants' conduct precipitated and caused the sequence of events that ultimately resulted in the deprivation of plaintiff's liberty.

180.    Defendants' conduct in this regard was so egregious and outrageous as to shock the conscience.

## SIXTH CLAIM - AGAINST ALL INDIVIDUAL DEFENDANTS

### (**Brady** Violations Under 42 U.S.C. § 1983)

181.    Plaintiff repeats and re-alleges each and every allegation set forth above as though fully set forth at length herein.

182.    The conduct and actions of defendants, acting under color of law, suppressed and failed to disclose to either the prosecution or defense material evidence that was favorable to plaintiff, either because of its exculpatory or impeachment value, in violation of plaintiff's substantive and procedural due process rights and Brady v. Maryland, 373 U.S. 83 (1963) and its progeny.

183.    Said suppression and failure to disclose was done intentionally, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of their acts, and was done without lawful justification or reason, and was designed to and did cause specific and serious pain and suffering in violation of plaintiff's Constitutional rights and guaranteed under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

## SEVENTH CLAIM - AGAINST DEFENDANT CITY

### (**Municipal Liability Monell Claim under 42 U.S.C. § 1983**)

184.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

185.    All of the acts by the police defendants described above were carried out pursuant to policies and practices of the City of New York which were in existence at the time

FIRST AMENDED COMPLAINT - 33

1   of the conduct alleged herein and were engaged in with the full knowledge, consent, and

2   cooperation and under the supervisory authority of the defendant City and its agency, the NYPD.

3       186.    Defendant City and the NYPD, by their policy-making agents, servants and

4   employees, authorized, sanctioned and/or ratified the police defendants' wrongful acts; and/or

5   failed to prevent or stop these acts; and/or allowed or encouraged these acts to continue.

6       187.    The actions of the police defendants resulted from and were taken pursuant to de

7   facto policies and/or well-settled and widespread customs and practices of the City, which are

8   implemented by police officers, to prosecute and continue to prosecute persons through

9   fabricated and manipulated allegations without adequate basis in fact and/or despite exculpatory

10  evidence known to them and withheld from accused persons, including plaintiff herein, in

11  furtherance of a plan to deprive such persons of their right to a fair trial and to secure and

12  sustain criminal convictions at all costs.

13      188.    The existence of such unlawful de facto policies and/or well-settled and

14  widespread customs and practices has been known to supervisory and policy-making officers

15  and officials of the NYPD and the City for a substantial period of time.

16      189.    Despite knowledge of such unlawful de facto policies and practices, these

17  supervisory and policy-making officers and officials of the NYPD and the City and their

18  predecessors in interest did not take steps to terminate these policies and practices, did not

19  discipline individuals who engaged in such practices, or otherwise properly train police officers

20  with regard to the constitutional and statutory limits on the exercise of their authority, and

21  instead sanctioned and ratified these policies, customs, and practices through their deliberate

22  indifference to or reckless disregard of the effect of said policies, customs and practices upon

23  the constitutional rights of persons in the City of New York.

FIRST AMENDED COMPLAINT - 34

190.    The failure of defendant City and the NYPD to properly train and supervise defendants Assencao, Messa, Kenny, Hachadoorian, Buell, and Does 1-10 constituted a policy, custom and/or practice, and included, but was not limited to, the failure to instruct them in applicable provisions of the Penal Law and Criminal Procedure Law of the State of New York, the failure to instruct them in generally acceptable police investigative standards and techniques, and the failure to instruct them in state and federal constitutional limitations.

191.    The City's policies and practices in existence at the time of the conduct complained of herein, which caused plaintiff's injuries herein include, inter alia, the following:

    a.    Failing to forward to the offices of the District Attorneys evidence of unlawful acts committed by police personnel;

    b.    Failing to adequately investigate, monitor, audit, and respond to citizen complaints and other claims of police misconduct with the NYPD, such that defendant City and the NYPD knew about and acquiesced in a custom of tolerating constitutional, statutory, and common law violations;

    c.    Manufacturing evidence against individuals they have arrested;

    d.    The failure to properly supervise, train, instruct, and discipline police officers with regard to proper conduct and investigation at and in relation to a crime scene;

    e.    The failure to properly supervise, train, instruct, and discipline police officers with regard to the preparation of truthful accusatory instruments;

    f.    The failure to properly supervise, train, instruct, and discipline police officers with regard to the preparation of truthful police paperwork, or to correctly and accurately document and preserve evidence or to memorialize investigative

steps taken, or circumstances surrounding the obtaining of evidence, that could be relevant to the investigation and/or prosecution, and/or discoverable in any litigation;

g.  The failure to properly supervise, train, instruct, and discipline police officers with regard to the New York State Penal Law and the state and federal Constitutions, and with regard to adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

h.  The failure to properly supervise, train, instruct, and discipline police officers with regard to the exercise of their authority, including, without limitation, in regard to disclosure of exculpatory and/or impeaching evidence;

i.  The failure to disclose to the prosecution or the defense material evidence that is favorable to the accused person(s), either because of its exculpatory or impeachment value, in violation of an accused person's substantive and procedural due process rights and Brady v. Maryland, 373 U.S. 83 (1963) and its progeny;

j.  The failure to properly supervise, train, instruct, and discipline police officers with regard to proper methods of conducting interviews of witnesses and/or accused persons, and to discipline police officers who use improper methods to coerce and/or elicit false statements;

k.  The failure to properly supervise, train, instruct, and discipline police officers, including defendants herein, known to be irresponsible in their dealings with citizens of the community, known to violate state and federal law and state and

FIRST AMENDED COMPLAINT - 36

federal constitutional limitations in their investigative and law enforcement conduct, known to fabricate and falsify evidence, known to manipulate, intimidate, threaten, and coerce witnesses, known to deprive criminal defendants of their right to a fair trial, and known to arrest and initiate/continue prosecution in the absence of probable cause;

l.  Failing to establish or assure the functioning of a bona fide and meaningful departmental system for dealing with complaints of police misconduct, but instead responding to these types of complaints with bureaucratic power and official denials calculated to mislead the public;

m.  Failing to adequately investigate, monitor, audit, and respond to citizen complaints and other claims of police misconduct with the NYPD, such that defendant City and the NYPD knew about and acquiesced in a custom of tolerating constitutional, statutory, and common law violations;

n.  The failure to properly supervise, train, instruct, and discipline police officers with regard to proper, and constitutional, methods of conducting identification procedures, and of adequately preserving and documenting all critical aspects of such procedures, including the circumstances surrounding the procedure and all statements made by or to the witness participating in the procedure;

o.  The tacit acceptance of and encouragement of a code of silence wherein police officers regularly cover up police misconduct by refusing to report other officers' misconduct or by telling false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the Civilian Complaint Review

FIRST AMENDED COMPLAINT - 37

1   Board ("CCRB") and the Internal Affairs Bureau, and in public statements

2   designed to cover for and/or falsely exonerate accused police officers;

3   p.   Arresting innocent persons in order to meet "performance/productivity goals"

4   (i.e., arrest quotas), and thereafter concocting stories, fabricating evidence, and

5   suppressing the truth to conceal the fact that they made arrests to meet

6   performance/productivity goals. The existence of such quotas within the NYPD

7   is well recognized and illustrated by <u>Raniola v. Bratton</u>, 243 F.3d 610 (2d Cir.

8   2001); <u>see also</u> <u>Bryant v. City of New York, et al.</u>, Index No. 22011/2007 (Sup.

9   Ct. Kings Co.) (jury determined that NYPD maintains a quota policy for

10   arrests);

11   q.   Encouraging and/or failing to discipline officers for "testilying" and/or

12   fabricating false evidence to bring about the police officers' preconceived

13   perceptions or determinations of guilt, including, but not limited to, such

14   perceptions and/or determinations influenced by racial prejudice and/or ethnic

15   bias;

16   r.   Arresting innocent persons and taking steps to ensure their criminal convictions

17   in order to "close out" open investigations, especially of otherwise unsolved

18   felony matters, in order to create the appearance effective policing and to

19   improve statistical performance under the CompStat system.

20   192.   The aforementioned City policies, practices and customs of failing to supervise,

21   train, instruct and discipline police officers and encouraging their misconduct are evidenced by

22   the broad sweeping police misconduct detailed herein, where distinct sets of police officers

23   endeavored to procure the prosecution and conviction of plaintiff on charges of which plaintiff

FIRST AMENDED COMPLAINT - 38

was in fact innocent by, inter alia, creating and fabricating evidence to create the appearance of probable cause that plaintiff had committed the burglary and related offenses, intentionally and maliciously concealing material exculpatory evidence, suborning perjurious testimony, and unduly influencing the statements and testimony of witnesses and the identifications made by witnesses by means of threats, coercion, pressure, and deceit. These officers represent the corrupt policies and practices of various investigative units of the NYPD.

193. The City policies, practices and customs in existence at the time of failing to supervise, train, instruct, and discipline police officers and encouraging their misconduct are further evidenced, inter alia, by the following:

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), states:

"In the face of this problem [of corruption], the [New York City Police] Department allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption controls minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputation tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of

such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what this Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment.

"For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it."

b. The Mollen Commission concluded that police perjury and falsification of official records

"is probably the most common form of police corruption facing the criminal justice system ….

\* \* \*

"Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors.   Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.

\* \* \*

FIRST AMENDED COMPLAINT - 40

"What breeds this intolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, 'doing God's work' – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, 'What's wrong with that? They're guilty.'"

c. Since at least 1984, defendant City and the NYPD have been on notice that their training of police officers has been inadequate and that police officers joining the force, including, on information and belief, individual defendant police officers herein, were disproportionately involved in misconduct and abuse. See, e.g., Mayor's Advisory Committee on Police Management and Personnel Policy, Final Report, February 24, 1987.

d. The City of New York Office of the Comptroller, in an unpublished report, found that the police often conduct inadequate investigations.

e. In the vast majority of police misconduct cases that result in verdicts or substantial settlements for the victims, defendant City imposes no discipline,

FIRST AMENDED COMPLAINT - 41

1    either before or after resolution in court, almost never reopens an investigation

2    previously conducted after such resolution, and sometimes promotes the abusive

3    officer to a position of greater authority despite the judicial resolution.

4    f.  Former New York County District Attorney Robert Morgenthau has been

5    quoted as acknowledging that in the NYPD there is a "code of silence," or a

6    "code of protection" that exists among officers and that is followed carefully.

7    g.  In 1985, former Police Commissioner Benjamin Ward, testifying before a State

8    Senate Committee, acknowledged the existence of the "code of silence" in the

9    NYPD.

10    h.  Former New York City Police Commissioner Robert Daly wrote that the "blue

11    wall of solidarity with its macho mores and prejudices, its cover-ups and silence,

12    is reinforced every day in every way."

13    194.   Upon information and belief, police officers receive no training or woefully

14  inadequate training regarding documentation of witness statements in a manner that will

15  accurately documents and preserve the true circumstances surrounding identification procedures.

16    195.   Upon information and belief, police officers receive no training or woefully

17  inadequate training regarding documentation of witness statements in a manner that will

18  accurately memorialize and preserve exculpatory and impeaching information.

19    196.   Upon information and belief, police officers receive no training or woefully

20  inadequate training regarding their disclosure obligations regarding potentially exculpatory and

21  impeaching information, and in fact are encouraged and indoctrinated to not document or

22  preserve any such evidence, but instead to suppress such evidence and withhold the fact of its

23  existence from the prosecution, the court, and the defense.

FIRST AMENDED COMPLAINT - 42

197. Upon information and belief, police officers receive no training or woefully inadequate training regarding maintaining the integrity and veracity of statements provided to them by witnesses or others, and are encouraged and indoctrinated in the use of isolation, false promises, threats, intimidation, and deceit to manipulate and influence witnesses, and to create and fabricate evidence to create the appearance of probable cause.

198. Upon information and belief, defendant City and its agency, the NYPD, failed to effectively screen, hire, train, supervise and discipline their police officers, including the defendant police officers herein, for racial bias, lack of truthfulness, and for their failure to protect citizens from the unconstitutional conduct of other police officers, thereby permitting and allowing the defendant police officers to be in a position to manipulate witnesses, manufacture and fabricate evidence, and conceal evidence so as to secure convictions in violation of federal and state constitutional rights, and/or to permit these actions to take place with those officers' knowledge or consent.

199. On information and belief, the defendant police officers herein were the subject of prior civilian and departmental complaints of misconduct that gave notice to, or should have given notice to defendant City and its agency, the NYPD, that the defendant police officers herein were likely to engage in conduct that would violate the civil and constitutional rights of the public, such as the conduct complained of by plaintiff herein.

200. On information and belief, defendants City and the NYPD had prior notice of the vicious propensities of all of the individual defendants herein, and of the inadequacies and constitutionally violative conduct in said police defendants' investigative techniques, and in said police defendants' conspicuous and regular pattern of conduct in depriving criminal defendants

1   of their right to a fair trial, but took no steps to train them, correct their abuse of authority, or to

2   discourage their unlawful use of authority.

3     201. The existence of the aforesaid unconstitutional customs and policies, as well as

4   notice to defendant City of the need to supervise and/or train and/or discipline defendants herein,

5   may be inferred from repeated occurrences of similar wrongful conduct, as documented in the

6   following civil rights actions filed against the City of New York and defendants herein named:

7      a. <u>Smith v. City of New York, et al</u>, Index No. 700464/2014 (Sup. Ct. Queens Co.)

8      b. <u>Taant v. The City of New York, et ano</u>, Index No. 709517/2015 (Sup. Ct. Queens

9       Co.)

10     c. <u>Morety v. The City of New York, et ano.</u>, Index No. 711195/2015 (Sup. Ct.

11      Queens Co.)

12     d. <u>Valerio v. City of New York, et al</u>, 13-cv-01259 (BMC)

13     e. <u>Roche v. Buell et al</u>, 04-cv-00293 (NGG) (MDG) (EDNY)

14     f. <u>Brunson v. The City of New York, et al</u>, 07-cv-02308 (CBA) (RER) (EDNY)

15     g. <u>Floyd v. The City of New York, et al</u>, Index No. 7012/1995 (Sup. Ct. Kings Co.)

16    202. As a result of the foregoing conscious policies, practices, customs and/or usages,

17  defendant City and its agency, the NYPD, permitted and allowed the employment and retention

18  of individuals as police officers whose individual circumstances place the public or segments

19  thereof at substantial risk of being the victims of racially motivated behavior and of

20  preconceived determinations of guilt.

21    203. Plaintiff's injuries were a direct and proximate result of the defendants' wrongful

22  policies, practices, customs and/or usages complained of herein and in existence at the time of

23  the incidents complained of herein and of the knowing and repeated failure of the defendant

FIRST AMENDED COMPLAINT - 44

City and the NYPD, and the PSA 9 and 114th Precincts, to properly supervise, train and discipline their police officers and detectives and law enforcement personnel.

204.    Defendant City is directly liable and responsible for the acts of the defendant officers because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the NYPD, and to require compliance with the constitutions and laws of the State of New York and of the United States.

205.    That the failure to supervise and/or train by defendant City of its agents and employees, including, without limitation, defendants Assencao, Messa, Kenny, Hachadoorian, Buell, and Does 1-10 rose to the level of deliberate indifference to the consequences of its actions, and indifference to plaintiff's rights, privileges and immunities secured by the Constitution of the United States of America, inter alia, plaintiff's Fourth and Fourteenth Amendment rights.

206.    The U.S. Supreme Court has held that "[w]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." Connick v. Thompson, 563 U.S. 51, 61 (2011) (citing Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 407 [1997]).  Official municipal policy "may be pronounced or tacit and reflected in either action or inaction." Cash v. County of Erie, 654 F.3d 324, 334 (2d Cir. 2011).

207.    The NYPD has inadequately screened, hired, retained, trained, and supervised its employees, including the individual defendants herein, to respect the constitutional rights of those individuals with whom NYPD police officers come in contact.

FIRST AMENDED COMPLAINT - 45

208.    The foregoing customs, policies, practices, procedures, rules, and usages constituted deliberate indifference to plaintiff's safety, well-being, and constitutional rights.

209.    The foregoing customs, policies, practices, procedures, rules, or usages were the direct and proximate cause of the constitutional violations suffered by plaintiff.

210.    The foregoing customs, policies, practices, procedures, rules, or usages were the moving force behind the constitutional violations suffered by plaintiff.

## EIGHTH CLAIM – AGAINST DEFENDANTS KENNY AND BUELL

### (Supervisory Liability for Failure to Train/Supervise under 42 U.S.C. § 1983)

211.    Plaintiff repeats and re-alleges each and every allegation set forth above as though fully set forth at length herein.

212.    Defendants Kenny and Buell had prior notice of the propensities of defendants Assencao, Messa, Hachadoorian, and Does 1-10 and the inadequacies and constitutionally violative conduct in said defendants' investigative techniques, and in said defendants' conspicuous and regular pattern of conduct in depriving criminal defendants of their rights to a fair trial, but took no steps to train them, correct their abuse of authority, or to discourage their unlawful use of authority.

213.    The failure of defendants Kenny and Buell to properly train and/or supervise defendants Assencao, Messa, Hachadoorian, and Does 1-10 included, but was not limited to, the failure to instruct them in applicable provisions of the Penal Law and Criminal Procedure Law of the State of New York, the failure to instruct them in generally acceptable police investigative standards and techniques, and the failure to instruct them in state and federal constitutional limitations.

FIRST AMENDED COMPLAINT - 46

214.    Defendants Kenny and Buell authorized, tolerated as institutionalized practices, and ratified the misconduct detailed above by, among other things:

a.  Failing to properly discipline, train, restrict, and control defendants Assencao, Messa, Hachadoorian, and Does 1-10   known to be irresponsible in their dealings with citizens of the community, known to violate state and federal law and state and federal constitutional limitations in their investigative and law enforcement conduct, known to fabricate and falsify evidence, known to deprive criminal defendants of their right to a fair trial, and known to arrest and initiate/continue prosecution in the absence of probable cause;

b.  Failing to take adequate precautions in the training, hiring, promotion, and retention of police personnel, including specifically defendants Assencao, Messa, Hachadoorian, and Does 1-10;

c.  Failing to forward to the offices of the District Attorneys evidence of unlawful acts committed by police personnel;

d.  Failing to establish or assure the functioning of a bona fide and meaningful departmental system for dealing with complaints of police misconduct, but instead responding to these types of complaints with bureaucratic power and official denials calculated to mislead the public;

e.  Failing to adequately investigate, monitor, audit, and respond to citizen complaints and other claims of police misconduct with defendants Assencao, Messa, Hachadoorian, and Does 1-10, such that defendant Kenny knew about and acquiesced in a custom of tolerating constitutional, statutory, and common law violations;

FIRST AMENDED COMPLAINT - 47

f.   Creating policies or customs under which unconstitutional practices occurred;

g.   Manufacturing evidence against individuals they have arrested;

h.   Allowing the continuance of such policies or customs;

i.   Failure to act on information indicating that unconstitutional acts were occurring;

j.   Allowing innocent persons to be arrested and prosecuted in order to meet "performance/productivity goals" (i.e., arrest quotas), and thereafter concocting stories, fabricating evidence, and suppressing the truth to conceal the fact that they made arrests to meet performance/productivity goals.  The existence of such quotas within the NYPD is well recognized and illustrated by <u>Raniola v. Bratton</u>, 243 F.3d 610 (2d Cir. 2001); <u>see also</u> <u>Bryant v. City of New York, et al.</u>, Index No. 22011/2007 (Sup. Ct. Kings Co.) (jury determined that NYPD maintains a quota policy for arrests);

k.   Encouraging and/or failing to discipline officers for "testilying" and/or fabricating false evidence to bring about the police officers' preconceived perceptions or determinations of guilt, including, but not limited to, such perceptions and/or determinations influenced by racial prejudice and/or ethnic bias;

l.   Encouraging and/or failing to discipline officers for arresting innocent persons and taking steps to ensure their criminal convictions in order to "close out" open investigations, especially of otherwise unsolved felony matters, in order to create the appearance effective policing and to improve statistical performance under the CompStat system.

FIRST AMENDED COMPLAINT - 48

215.    That the failure to supervise and/or train by defendants Kenny and Buell of defendants Assencao, Messa, Hachadoorian, and Does 1-10 rose to the level of deliberate indifference to the consequences of his actions, and indifference to plaintiff's rights, privileges and immunities secured by the Constitution of the United States of America inter alia, plaintiff's Fourth and Fourteenth Amendment rights.

## NINTH CLAIM – AGAINST ALL DEFENDANTS

### (Violations of the New York State Constitution)

216.    Plaintiff repeats and re-alleges each and every allegation set forth above as though fully set forth at length herein.

217.    Defendants, through the actions alleged above, consciously disregarded known and excessive risks to plaintiff's liberty and welfare and engaged in a deliberate and unjustified effort to manufacture guilt against plaintiff in furtherance of a plan to secure and sustain an unjust conviction against plaintiff.

218.    This included a course of conduct and pattern of behavior whereby defendants, inter alia, created and fabricated evidence to create the appearance of probable cause to believe that plaintiff had committed the burglary and related offenses, intentionally and maliciously concealed material exculpatory evidence, suborned perjurious testimony, and unduly influenced the statements and testimony of witnesses by means of threats, coercion, pressure, and/or deceit.

219.    In furtherance of this course of conduct and pattern of behavior defendants engaged in intimidation, violence, threats, and deceit whereby defendants failed to disclose material exculpatory and/or impeaching evidence before, during, and after plaintiff's trial, fabricated evidence, coerced, intimidated, and pressured witnesses, and developed and

FIRST AMENDED COMPLAINT - 49

cultivated witnesses to testify falsely. Defendants engaged in this misconduct in order to secure an indictment against plaintiff and in order to secure a criminal conviction against him.

220. That by virtue of the aforementioned acts, defendants also deprived plaintiff of his liberty without due process of law, in contravention of Article I, § 6 of the New York State Constitution.

221. That by virtue of the aforementioned acts, defendants are liable to plaintiff for violating his right to be free of unreasonable and unlawful searches and seizures under Article I, § 12 of the New York State Constitution.

222. The acts and conduct of the agents and employees of defendants were the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

223. That defendant City is also liable for the damages suffered by plaintiff as a result of the conduct of its agents, servants, and/or employees under the doctrine of respondeat superior.

\* \* \*

FIRST AMENDED COMPLAINT - 50

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff demands the following relief jointly and severally against all the

defendants:

    a.   Compensatory damages in an amount to be determined at trial;

    b.   Punitive damages in an amount to be determined at trial;

    c.   Attorneys' fees pursuant to 42 U.S.C. § 1988;

    d.   An award of plaintiff's costs of suit;

    e.   Pre-judgment and post-judgment interest;

    f.   Such other relief as this Court deems just and proper.


Dated this 2nd day of January, 2017

*Ameer Benno*
_____
Ameer Benno, Esq.

FINZ & FINZ, P.C.
410 East Jericho Turnpike
Mineola, NY 11501
Tel.: (516) 433-3000

FIRST AMENDED COMPLAINT - 51